In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-1224

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

and

STATE OF NEW YORK, *et al.*,

*Plaintiffs-Intervenors/Appellees*,

*v.*

CINERGY CORPORATION, *et al.*,

*Defendants-Appellants*.

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:99-CV-01693—**Larry J. McKinney**, *Chief Judge*.

———————

ARGUED JUNE 2, 2006—DECIDED AUGUST 17, 2006

———————

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The Environmental Protection Agency sued the owner of a number of coal-fired electric power plants claiming that the owner (Cinergy) had violated section 165(a) of the Clean Air Act, 42 U.S.C. § 7475(a), by physically modifying the plants without first obtaining from the EPA a permit that the agency

contends is required by EPA regulation 40 C.F.R. § 52.21 for the type of modification that Cinergy made. (Other regulations are applicable to some of Cinergy's facilities but are materially identical to section 52.21, see *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) (per curiam), and so needn't be discussed separately.) The modifications produced increases in the nitrogen oxides and sulfur dioxide annually emitted by the plants. If the EPA prevails in the suit, Cinergy will be required to retrofit the plants with costly pollution-control equipment ("best available control technology"). § 52.21(j)(3).

Cinergy argues that the regulation does not require modifications that do not increase the *hourly* rate at which a plant emits pollutants, even if the modifications increase the *annual* rate. The EPA argues that Cinergy is misreading the regulation. The district judge agreed with the EPA but authorized Cinergy to take an interlocutory appeal from his ruling, and we have consented to take the appeal. 28 U.S.C. § 1292(b).

The validity of the regulation is not in issue, just its meaning. Only the U.S. Court of Appeals for the District of Columbia Circuit has jurisdiction to review the validity of nationally applicable regulations issued pursuant to the Clean Air Act, 42 U.S.C. § 7607(b)(1); *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 914 n. 6 (7th Cir. 1990); *Natural Resources Defense Council, Inc. v. EPA*, 194 F.3d 130, 135 (D.C. Cir. 1999), and 40 C.F.R. § 52.21 is such a regulation.

It requires a permit for any "major modification," defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the [Clean Air] Act."

§ 52.21(b)(2)(i). (All our quotations are from the regulation as it read before revisions in 2002 that are inapplicable to this proceeding and, if applicable, would not affect our analysis.) "Physical change" excludes among other things "routine maintenance, repair and replacement," which Cinergy concedes its plant modifications were not. But it also excludes "an increase in the hours of operation or in the production rate." §§ 52.21(b)(2)(iii)(*a*), (*f*). That is, merely running the plant closer to its maximum capacity is not a major modification because it does not involve either a physical change or a change in the *method* of operation. If, however, a physical change enables the plant to increase its output, then, according to the EPA's interpretation, the exclusion for merely operating the plant for longer hours is inapplicable.

"Net emissions increase" is defined, so far as bears on this case, as "any increase in actual emissions from a particular physical change or change in method of operation." § (b)(3)(i)(*a*). A "significant" net emissions increase is measured by the "rate of emissions that would equal or exceed" specified numbers of "tons per year" of the various pollutants. § (b)(23)(i). "Actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period…. Actual admissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period." § (b)(21)(ii).

Since both the base emissions rate from which a significant increase is calculated, and the amount of the increase, are in terms of tons per year rather than per hour, the natural reading of the regulation is that any physical change or change in operating methods that

increases annual emissions is covered. Cinergy argues that calculating "actual emissions . . . using . . . actual operating hours," § (b)(21)(ii), "means that an 'emissions increase' is found only if the hourly rate of emissions increases as a result of physical change." But "actual operating hours" is more naturally read to mean the total number of hours that the plant is in operation. Suppose that before some physical change the plant operated an average of 18 hours a day, and the change enabled it to operate 24 hours a day. Since the regulation is concerned with the "increase in *actual* emissions" rather than with a *potential* increase in emissions, § 52.21(b)(21)(v); *Wisconsin Electric Power Co. v. Reilly*, *supra*, 893 F.2d. at 916; *New York v. EPA*, *supra*, 413 F.3d at 15, the plant could not *automatically* be assumed to operate 24 hours a day after the modification was made—there might not be enough demand to justify such continuous operation. But suppose a reasonable estimate was that the plant would operate an average of 20 hours a day with the modification; then, as a first approximation, a reasonable estimate of the contribution of the modification to pollution would be that the modification had increased the plant's annual emissions by about 10 percent. This estimate would determine whether the company needed a permit for the modification.

Cinergy's suggested interpretation, besides not conforming well to the language of the regulation, would if adopted give a company that had a choice between making a physical modification that increased the hourly emissions rate and one that enabled an increase in the number of hours of operation an incentive to make the latter change even if that would produce a higher annual level of emissions, because it would elude the permit requirement.

Cinergy's interpretation would also distort the choice between rebuilding an old plant and replacing it with a new

one. The Clean Air Act treats old plants more leniently than new ones because of the expense of retrofitting pollution-control equipment. *Wisconsin Electric Power Co. v. Reilly, supra*, 893 F.2d at 909-10. But there is an expectation that old plants will wear out and be replaced by new ones that will be subject to the more stringent pollution controls that the Clean Air Act imposes on new plants. One thing that stimulates replacement of an old plant is that aging produces more frequent breakdowns and so reduces a plant's hours of operation and hence its output. Cinergy's interpretation would give the company an artificial incentive to renovate a plant and by so doing increase the plant's hours of operation, rather than to replace the plant. For by going the first route it could increase the plant's output without having to invest in preventing the enhanced output from generating increased pollution.

The fact that the EPA's interpretation avoids some bad consequences doesn't prove that it's correct. But it does scotch the argument that the interpretation produces such outlandish consequences that it must be incorrect—which is not to say that Cinergy's interpretation must be incorrect because *it* would produce outlandish results. It would not, as suggested by the EPA's having put out for comment a proposal to change the regulation to the hourly-emissions standard favored by Cinergy. See *Prevention of New Source Deterioration, Nonattainment New Source Review, and New Source Performance Standards: Emissions Test for Electric Generating Units*, 70 Fed. Reg. 61081 (Oct. 20, 2005). Under the existing regulation as interpreted by the EPA, Cinergy, rather than having to choose between repair and replacement to enhance output, might decide to buy electricity from other electric utilities, and their plants might pollute more than Cinergy's do. And while Cinergy can determine a plant's hourly rate of emissions

easily enough just by observing the plant in operation, it cannot predict the plant's annual emissions rate because that depends on the number of hours of operation; and who knows in advance how many hours a plant will operate? Of course the company can always curtail those hours if it sees itself approaching the ceiling. But that might complicate its customer relations, as well as sacrificing significant revenue. What is required for determining whether a construction permit must be sought for a planned physical change in the plant is not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause; yet it may be a very difficult estimate to make.

Cinergy's principal argument, however, has nothing to do with the consequences of the alternative interpretations; it is that Congress required that the regulation define "modification" as a change in the hourly emissions rate. Since the regulation does not define it so, this seems an attack on the validity of the regulation rather than an argument about its meaning, and issues of validity, we pointed out, are beyond the jurisdiction of a regional circuit to resolve. In any event, the argument is unconvincing.

The Clean Air Act, as amended in 1970, required the EPA to devise "New Source Performance Standards" (NSPS), including standards for "modifications," defined as physical changes, or changes in operating methods, that increased the amount of pollutants emitted. 42 U.S.C. § 7411(a)(4). One of the standards that the agency adopted placed hourly limits on emissions from coal-fired electric power plants. After further amending the Act in 1977 to require the EPA to take steps to prevent significant deterioration (PSD) in air quality—it is pursuant to these amendments that the regulation at issue in this case was promulgated, see 42 U.S.C. § 7477—Congress amended the amendments to

provide that "modifications" would bear the same meaning in the PSD provisions as the word bore in the NSPS provisions. § 7479(2)(C); *Wisconsin Electric Power Co. v. Reilly*, *supra*, 893 F.2d at 905; *New York v. EPA*, *supra*, 413 F.3d at 13. But the statutory definition of "modifications" to which Congress was referring says nothing about hourly versus annual emissions. § 7411(a)(4). The hourly-emission standard under the New Source Performance Standards is a creature of regulation, 40 C.F.R. §§ 60.14(a)-(b), and the "same meaning" statutory amendment does not purport to incorporate the agency's regulatory definition of modifications under the New Source Performance Standards into the provisions relating to the Prevention of Significant Deterioration program.

Cinergy's argument was rejected by the D.C. Circuit in *New York v. EPA*, *supra*, which upheld the EPA's interpretation of the regulation. But it was accepted by the Fourth Circuit in *United States v. Duke Energy Corp.*, 411 F.3d 539, 546-51 (4th Cir. 2005), cert. granted, 126 S. Ct. 2019 (2006), creating a circuit conflict that the Supreme Court presumably granted certiorari in the *Duke Energy* case to resolve.

In so ruling, the Fourth Circuit stepped out of bounds, as we have said in describing Cinergy's argument. But in any event the argument's premise is incorrect. The same word can mean different things in the same statute. See *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 595-96 (2004); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 342-44 (1997); *Indianapolis Life Insurance Co. v. United States*, 115 F.3d 430, 434-35 (7th Cir. 1997), and with specific reference to the Clean Air Act *Potomac Electric Power Co. v. EPA*, 650 F.2d 509, 518 (4th Cir. 1981); *Northern Plains Resource Council v. EPA*, 645 F.2d 1349, 1355-56 (9th Cir.

1981). "There is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U.S. 427, 433 (1932).

Because many words have multiple meanings, the same word might well be used in one sense in one part of a statute and another sense in another. That is certainly the case with a vague word like "modification," and all the more when the statutory provisions that contain the word were enacted by different Congresses for different purposes. *United States ex rel. Long v. SCS Business & Technical Institute, Inc.*, 173 F.3d 870, 881 n. 15 (D.C. Cir. 1999). The New Source Performance Standards part of the Act, the older part, imposes specific technical requirements on polluters, and it is natural therefore that "modification" in that part of the Act should refer to physical changes in the plant. The Prevention of Significant Deterioration part of the Act leans toward the more modern approach of limiting output (pollution) rather than inputs (technology), and so it is equally natural to interpret "modification" in that part more broadly in order to prevent opening a loophole that would allow pollution to soar unregulated. See *Potomac Electric Power Co. v. EPA*, *supra*, 650 F.2d at 518; *Alabama Power Co. v. Costle*, 636 F.2d 323, 402 (D.C. Cir. 1980) (per curiam).

Furthermore, a vague statutory term in a regulatory statute can operate as a delegation to the regulatory agency to supply meaning. *Washington State Dept. of Social & Health Services v. Guardianship Estate of Danny Keffeler*, 537 US. 371,

389-90 (2003); *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-46 (1984). The New Source Performance Standards and Prevention of Significant Deterioration provisions of the Clean Air Act are at one in defining a modification as a physical change in a plant that results in an increase in emissions, but are silent on whether the increase is in the hourly rate of emissions or in some other rate. The task of deciding was left to the EPA. There was nothing to require that it flesh out the vague statutory meaning in the identical way in different parts of the Clean Air Act adopted years apart and reflecting, to an extent anyway, different philosophies of pollution control.

Cinergy's other arguments are makeweights, and we will not extend this opinion to discuss them.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*