ATTORNEY FOR APPELLANT
Kim E. Ferraro
Valparaiso, Indiana

Benjamin H. Longstreth
Washington, D.C.

ATTORNEY FOR APPELLEES,
POET BIOREFINING – NORTH
MANCHESTER, LLC, AND POET
BIOREFINING – CLOVERDALE,
LLC
Therese A. Czajka
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE,
CENTRAL INDIANA ETHANOL,
INC.
Anthony C. Sullivan
E. Sean Griggs
Mark J. Crandley
Timothy A. Haley
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE,
INDIANA DEPARTMENT OF
ENVIRONMENTAL
MANAGEMENT
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Carol S. Comer
Andrew R. Falk
Deputy Attorneys General

ATTORNEYS FOR INTERVENOR,
GREEN PLAINS BLUFFTON, LLC
Vicki J. Wright
Bryan S. Strawbridge
Indianapolis, Indiana

ATTORNEYS FOR INTERVENOR,
THE ANDERSONS CLYMERS
ETHANOL, LLC
Joseph S. Simpson
Louis E. Tosi
Toledo, Ohio

John E. Haller
Columbus, Ohio

ATTORNEYS FOR AMICUS
CURIAE, THE RENEWABLE
FUELS ASSOCIATION
John S. Paniaguas
Chicago, Illinois

Charles H. Knauss
Shannon S. Broome
Robert T. Smith
Washington, D.C.

# In the
# Indiana Supreme Court

**FILED**

Kevin S. Smith

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 49S02-1405-MI-313

NATURAL RESOURCES DEFENSE COUNCIL,

*Appellant (Respondent below),*

v.

POET BIOREFINING – NORTH MANCHESTER,
LLC, POET BIOREFINING – CLOVERDALE,
LLC, CENTRAL INDIANA ETHANOL, INC.,

AND THE INDIANA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT,

*Appellees (Petitioners below)*,

GREEN PLAINS BLUFFTON, LLC, AND
ANDERSONS CLYMERS ETHANOL, LLC,

*Intervenors below*.

—————————————————

Appeal from the Marion Superior Court, No. 49F12-1102-MI-5363
The Honorable David J. Certo, Judge
The Honorable Valerie Horvath, Commissioner

—————————————————

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1205-MI-423

—————————————————

**September 2, 2014**

**David, Justice.**

Agencies at both the state and federal level are tasked with promulgating, interpreting, and enforcing specific regulations pertaining to their particular area of expertise. Because of the agencies' degree of expertise, courts exercise significant deference in reviewing those interpretations. Here, Indiana's environmental agency revised its interpretation of a regulatory term and that interpretation was challenged and subjected to judicial review. But in light of the deference we show to such an agency assessment of its own regulations, we find the new interpretation reasonable—and because no more formal revision process was required, we affirm the trial court.

**The Clean Air Act and Indiana's Implementation Plan**

The U.S. Clean Air Act is a federal framework through which states can develop pollution prevention and control programs, and it seeks to encourage "reasonable Federal, State, and local government actions" consistent with the standards contained within that framework.

42 U.S.C. § 7401(c). To this end, the federal government—through Congress and the Environmental Protection Agency—establishes National Ambient Air Quality Standards, and the individual states must submit to the EPA their plans to implement or enforce the NAAQS within their borders. 42 U.S.C. §§ 7409, 7410(a)(1). These State Implementation Plans do not have effect until they are approved by the EPA. See Envtl. Def. v. EPA, 467 F.3d 1329, 1331 (D.C. Cir. 2006). Any modification of a SIP must also be approved by the EPA before it has effect, see Sierra Club v. Ind.-Ky. Elec. Corp., 716 F.2d 1145, 1152 (7th Cir. 1983), thus an "existing SIP remains the 'applicable implementation plan' even after the State has submitted a proposed revision," General Motors Corp. v. U.S., 496 U.S. 530, 540 (1990).

The Clean Air Act also requires states to designate areas within their boundaries as either meeting the applicable NAAQS ("attainment" areas) or not meeting the applicable NAAQS ("nonattainment" areas). 42 U.S.C. § 7407(d). State SIPS are required to contain pollutant emission limitations and other regulatory measures in order "to prevent significant deterioration of air quality" within those designated attainment areas. 42 U.S.C. § 7471. And under the auspices of the Act's Prevention of Significant Deterioration program, no "major emitting facility" may be constructed or undergo major modifications without receiving a permit. 42 U.S.C. §§ 7475, 7479(C).

The Clean Air Act defines "major emitting facility" as a stationary facility capable of emitting airborne pollutants, subject to one of two broad categorizations. It is either one of twenty-eight types of facilities specifically listed in the Clean Air Act "which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant," or it is "any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant." 42 U.S.C. § 7479(1).

PSD review for a major emitting facility's permit requires a demonstration that "emissions from construction or operation of such facility will not cause, or contribute to, air pollution" in excess of set standards and that "the proposed facility is subject to the best available control technology for each pollutant." 42 U.S.C. § 7475(a)(3), (4). Those major emitting

facilities contained within the list of twenty-eight industrial source categories are also subject to stricter monitoring of their emission levels: their emission levels include not only the actual emissions directly produced by the facility (such as smoke from a smoke stack), but also "fugitive emissions" (such as pollutants that might leak from pipes or particles that might blow off the facility). 42 U.S.C. § 7602(j); 40 C.F.R. §§ 51.166(b)(1)(iii), 52.21(b)(1)(iii).

One of the twenty-eight specifically identified categories of industrial facility constituting a major emitting facility if it exceeds the 100 tons of pollutants per year threshold is "chemical process plants." 42 U.S.C. § 7479.[1] The term "chemical process plant" is not defined by the Clean Air Act, but up until 2007 the EPA consistently interpreted the term to include fuel ethanol plants. Thus, if a fuel ethanol plant was capable of exceeding the one hundred ton per year threshold it was classified as a major source facility; and if it was located in an attainment area then it was subject to PSD review and permitting.

On May 1, 2007, the EPA issued a final rule modifying the definition of major emitting facilities (the "Ethanol Rule"). 72 Fed. Reg. 24060. The rule, effective July 2, 2007, amended

---

[1] The full list includes

> [F]ossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, [and] charcoal production facilities.

42 U.S.C. § 7479(1).

the portions of the Clean Air Act and its supporting regulations to expressly exclude fuel ethanol plants from the term "chemical process plant." 72 Fed. Reg. at 24061; see 40 C.F.R. §§ 51.166(b)(1)(iii)(t), 52.21(b)(1)(iii)(t) ("term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140").

Indiana first submitted its SIP in 1972. See 40 C.F.R. § 52.770(a) (1998). In 2003, Indiana submitted an amendment to its SIP for EPA approval on February 1, 2002, incorporating PSD regulations; the EPA approved the amendments effective April 2, 2003. 68 Fed. Reg. 9892; see generally 326 Ind. Admin. Code 2-2. Since that time, Indiana has not formally modified or amended its SIP through the complete EPA approval process in any way relevant to this case.

The PSD provisions of Indiana's SIP largely parallel the Clean Air Act, in that the construction or modification of a "major stationary source" triggers PSD review and requirements. 326 Ind. Admin. Code 2-2-2(a). And a "major stationary source" in Indiana's SIP, like the "major emitting facility" from the Clean Air Act, includes sources that are either listed as one of the same twenty-eight industrial facility categories and capable of emitting more than 100 tons per year of a regulated pollutant, 326 Ind. Admin. Code 2-2-1(ff)(1), or are a stationary source capable of emitting 250 tons per year of a regulated pollutant, 326 Ind. Admin. Code 2-2-1(ff)(2). Like the Clean Air Act, chemical process plants are listed as one of the twenty-eight specific industrial categories, 326 Ind. Admin. Code 2-2-1(ff)(1)(U), and like the Clean Air Act the phrase "chemical process plant" is undefined in Indiana's SIP.

Up until the EPA issued its Ethanol Rule in 2007, Indiana consistently tracked the EPA's prior stance and interpreted "chemical process plant" to include fuel ethanol plants for the purposes of the Indiana PSD SIP. But after the Ethanol Rule was issued, IDEM began following the new EPA interpretation.

In 2011, the Indiana General Assembly passed a law providing that for purposes of Indiana's SIP, "chemical process plants" did not include fuel ethanol plants. Act of May 10,

5

2011, Public Law 159-2011, § 21(e), 2011 Ind. Acts 1614–15; Ind. Code § 13-17-3-4(e) (Supp. 2011).[2] IDEM then published a nonrule policy document, citing the EPA's Ethanol Rule and affirming its intention to interpret the phrase "chemical process plants" in Indiana's SIP in accordance with the Ethanol Rule—in other words, to exclude ethanol plants from being classified as chemical process plants. 20110525 Ind. Reg. 318110311NRA (May 25, 2011). This change was then incorporated into the Indiana Administrative Code, see 326 Ind. Admin. Code 2-2-1(ff)(1)(U), but again, Indiana's SIP has not yet been amended through the EPA approval process to codify this new interpretation.

## Facts and Procedural History

The facilities at issue in this case have the potential to emit more than 100 tons per year of pollutants, but less than 250 tons per year. But they produce fuel-grade ethanol, and whether such facilities are treated as chemical process plants therefore determines whether they are major stationary sources—and subject to the more rigorous PSD requirements—or not.

On March 26, 2010, IDEM issued an operating permit to Putnam County Ethanol, LLC ("Putnam County") for an ethanol facility. The permit identified the Putnam County facility as not being one of the twenty-eight source categories, and classified it as a "minor source." The permit therefore allowed the facility to emit pollutants up to 250 tons per year before PSD review would be triggered. And on May 5, 2010, IDEM issued a similar permit to POET Biorefining – North Manchester ("POET Biorefining") for an ethanol production facility.

NRDC sought administrative review of both permits. It claimed that because the permits did not classify the facilities as chemical process plants, the permits violated Indiana's SIP by

_____

[2] The provision expired by its own terms on April 1, 2012. Ind. Code § 13-17-3-4(e).

6

permitting annual emissions in excess of 100 tons per year without PSD review, and for failing to include fugitive emissions in the calculation of annual emissions. The two challenges were consolidated into one proceeding before the Indiana Office of Environmental Adjudication.

After these actions had been briefed, Central Indiana Ethanol, Inc., ("CIE"), which operates an ethanol facility, sought to intervene as NRDC had challenged a permit issued to it on similar grounds. The OEA denied this request.

On January 11, 2011, the OEA issued findings agreeing with NRDC and vacating the Putnam County and POET Biorefining permits. It ordered the permits remanded to IDEM, with instructions not to approve any further permits for the facilities unless they identified the ethanol plants as major emitting facilities—with all PSD restrictions that accompany such a classification. It later stayed the order so that the facilities could continue to operate while the matter was resolved.

Putnam County, POET Biorefining, and CIE all independently sought judicial review of the OEA order. Two other ethanol facilities, Green Plains Bluffton, LLC, ("GPB") and Andersons Clymers Ethanol, LLC, ("Andersons Clymers"), filed motions to intervene following NRDC challenges to their permits. The motions to intervene were granted and the petitions for review were consolidated into one action before the Environmental Division of the Marion County Superior Court.[3]

---

[3] While that action was pending before the trial court, NRDC's request for administrative review of CIE's permit still proceeded before the OEA. CIE filed a motion for summary judgment, arguing that the General Assembly's declaration—through Indiana Code § 13-17-3-4—that fuel ethanol plants were not to be considered as chemical process plants, and IDEM's amendment of the Indiana Administrative Code to reflect the same interpretation, rendered NRDC's challenge moot. The OEA agreed, distinguishing the order vacating the Putnam County and POET Biorefining permits because "the law that the OEA interpreted is no longer the law in Indiana" and granting summary judgment in

7

The trial court acknowledged that Indiana's EPA-approved 2003 SIP still governed Indiana's PSD program, but found that the phrase "chemical process plant" as used in the SIP was ambiguous. But it viewed the EPA's Ethanol Rule, the General Assembly's legislative action, IDEM's nonrule policy document, and the amendment of the Indiana Administrative Code, collectively, to be clear indicators of legislative intent that fuel ethanol plants should no longer be categorized as chemical process plants—and that the new interpretation did not conflict with any provision contained in Indiana's SIP or the Clean Air Act. It concluded that "ethanol production plants that produce ethanol by natural fermentation do not constitute 'chemical process plants'" and therefore reversed the OEA. (NRDC's App. at 12.)

NRDC appealed and the Court of Appeals reversed the trial court. Natural Res. Def. Council v. Poet Biorefining-North Manchester, LLC, et. al, 987 N.E.2d 531, 533, 539 (Ind. Ct. App. 2013). We granted transfer, thereby vacating the Court of Appeals opinion. Natural Res. Def. Council v. Poet Biorefining-North Manchester, LLC, et. al 7 N.E.3d 992 (Ind. 2014) (table); Ind. Appellate Rule 58(A).

**Standard of Review**

Judicial review of decisions made by administrative agencies is limited. LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000). We may only set aside the agency action on the grounds set forth in the Indiana Administrative Orders and Procedures Act. Id.; see Ind. Code § 4-21.5-5-14(d). "An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself," and we grant deference to the agency's findings of fact.

---

favor of CIE. (CIE's App. at 201.) NRDC sought judicial review of this order, but failed to timely file the agency record and its petition was dismissed.

8

Griffin, 730 N.E.2d at 1257. But its conclusions of law are entitled to no such deference and we review those conclusions *de novo*. Id.

**Discussion**

Technically, from a procedural standpoint the final agency action here was the OEA's decision to vacate the Putnam County and POET Biorefining permits. But on judicial review that cause was merged with un-adjudicated administrative challenges to permits issued to GPB and Andersons Clymers. And the OEA then eventually adjudicated the challenge to CIE's permit in favor of CIE, although judicial review of that determination was dismissed. So for simplicity and clarity in addressing three branches of administrative action—one branch favoring one side, one branch favoring the other side, and the third branch undecided—we focus instead on the root issue: NRDC's challenge to IDEM's change in its classification of fuel ethanol plants and whether such a change was permissible. This is also how the parties have approached their appeal of the trial court's decision.

NRDC challenges IDEM's policy change in a number of ways, but they boil down to two main arguments: was IDEM required to formally amend Indiana's SIP to effect the change, and if not, is IDEM's interpretation of the term "chemical process plant" correct?

**I.     SIP Revision Was Not Required.**

NRDC's argument on this issue is straightforward: that under Indiana's SIP, fuel ethanol plants are chemical process plants and that remains the governing law until the SIP is formally amended and approved by the EPA. And because it is unequivocal that IDEM did not amend its SIP, the permits at issue should therefore have classified the fuel ethanol facilities as chemical process plants. This argument, however, rests on a flawed foundation and cannot prevail.

9

The flaw is NRDC's initial premise that Indiana's SIP "defines" fuel ethanol plants as chemical process plants. NRDC argues that prior to the EPA's Ethanol Rule, "IDEM consistently classified fuel ethanol plants this way because that is what Indiana's SIP required." (NRDC's Br. at 25.) In fact, the Indiana SIP does no such thing—and at no point anywhere in its argument does NRDC actually point to a provision in either the SIP or the Clean Air Act containing such a definition.

NRDC argues that IDEM's new interpretation must go through the full proposal process, with full federal notice and comment proceedings before the EPA may approve it. But when no provision in the current SIP affirmatively classifies fuel ethanol plants as chemical process plants, what is there to revise through that process? We do not disagree with NRDC's assertions that Indiana's 2003 SIP remains valid and that no act of the Indiana General Assembly can overrule it; but when the SIP did not address the question of how fuel ethanol plants are classified, it cannot control IDEM's interpretation of that term. As IDEM says, "merely because IDEM and the EPA had a particular understanding of an undefined term at the time a SIP is approved does not render that understanding a *de facto* condition of the SIP approval." (IDEM's Br. at 9.)

NRDC points to the Seventh Circuit's decision in U.S. v. Cinergy Corp., 623 F.3d 455 (7th Cir. 2010), for support. It argues that this case "establishe[s] that Indiana, EPA, and regulated entities must continue to comply with the measures in an EPA-approved SIP even though a new state law was consistent with newer EPA rules." (NRDC's Br. at 28.) But we find Cinergy easily distinguishable, and therefore not controlling in this case.

In Cinergy, the EPA sued a number of facility owners, alleging that they had modified their facilities without obtaining the proper permits. 623 F.3d at 456. Cinergy acknowledged that Indiana's SIP had been revised to require a permit for future modifications like the one at issue and the EPA had later approved that amendment, but argued that the SIP in effect when the modifications actually took place preceded the revision and did not require a permit. Id. at 457. The Seventh Circuit agreed, finding that "[t]he Clean Air Act does not authorize the imposition

10

of sanctions for conduct that complies with a State Implementation Plan that the EPA has approved." Id. at 458.

But the critical regulatory question in Cinergy was whether permits were required for modifications resulting in an increase in a facility's hourly-rate capacity to produce electricity, or if the plants' actual emissions capacity was used instead. Id. at 457. A specific regulatory term defined "modification," and under the prior Indiana SIP that definition used the hourly-rate capacity—the amended SIP, though, "conform[ed] the definition of 'modification' to the actual-emissions standard." Id. at 457–58. Thus, the letter of the existing SIP specifically addressed which standard applied, and a SIP revision had been required to change that specific standard. And until that revision process was complete, the language of the existing SIP still controlled.

So Cinergy's statement about the validity of an existing SIP is certainly good law within its own context: when a provision of a state SIP defines a particular term, the state may not amend that definition—or reject it—without amending its SIP through the formal EPA approval process. And if the language of Indiana's SIP defined "chemical process plant" as specifically including fuel ethanol plants, that would certainly be the case here as well. But because there is no such correlating provision here defining either of those phrases, Cinergy simply does not bear on the outcome of NRDC's challenges.

The Ethanol Rule itself alludes to this very point. In it, the EPA noted that

> it may not be necessary for a State, local or tribal authority to revise its SIP . . . to begin to implement these changes. *Some State, local or tribal authorities may be able to adopt these changes through a change in interpretation of the term "chemical process plant" without the need to revise the SIP.*

72 Fed. Reg. at 24074 (emphasis added). It does, however, still encourage such authorities "to make such SIP . . . changes in the future to enhance the clarity of the existing rules," and points out that where SIP revision is required, "the changes are not effective in such area until we approve the SIP revision." 72 Fed. Reg. at 24075–76. So if a State's SIP, for example, listed

11

types of facilities—including fuel ethanol plants—as being under the heading of "chemical process plant," then the Ethanol Rule makes clear that formal SIP revision would be required. But again, that is not the case here.

NRDC also argues that Indiana's definition of a major stationary source incorporates the Standard Industrial Classification Manual ("SIC Manual"), which categorizes fuel ethanol plants as chemical process plants, and "IDEM has neither proposed nor obtained EPA approval for any SIP change that would alter the incorporation of the [SIC Manual] or otherwise provide that fuel ethanol facilities are no longer part of the Chemical Process Plant category." (NRDC's Br. at 38.) Again we disagree with NRDC's view.

Indiana's PSD SIP provides that the phrase "[b]uilding, structure, facility, or installation," includes "all of the pollutant-emitting activities that belong to the same industrial grouping, are located on one (1) or more contiguous or adjacent properties, and are under the control of the same person." 326 Ind. Admin. Code 2-2-1(j). "Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same major group, for example, that have the same first two (2) digit code, as described in the [SIC Manual]." Id.

We agree with IDEM that this provision "incorporates the SIC Manual strictly for the purpose of determining whether pollutant-emitting activities at a facility belong to the same industrial grouping." (IDEM's Br. at 11.) Whether the SIC Manual defines chemical process plants to include fuel ethanol plants or not, that definition is not incorporated into the PSD SIP's definition of major stationary source or chemical process plant. As such, it does not compel IDEM to formally amend the SIP in this case.

12

## II.    IDEM's Interpretation of Indiana's SIP is Reasonable.

Having determined that IDEM was not required to formally amend Indiana's SIP to effectuate its change in how it interprets the regulatory phrase "chemical process plant," we turn now to the question of whether this interpretation is itself legally permissible.  We find that it is.

As a starting point, NRDC argues that permitting clarifications or interpretations of the SIP "would render federal Clean Air Act SIPS fundamentally indeterminate and fluid," and "would severely undermine the clarity and certainty that the rule of law affords to both industry and the public."  (NRDC's Br. at 32.)  We do not see the consequences as being so dire.  Rather, this fluidity is precisely the point of such programs.

"The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 843 (1984) (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).  The same principle is true here at the state level.  And here, the purpose of the Clean Air Act is to create a framework within which states may regulate and operate.  To do so successfully, states and their implementing agencies must be afforded the flexibility to responsively adapt to changing technologies, market fluctuations, environmental conditions, and shifts in public policy.

Requiring the Clean Air Act and SIPs to contain each and every rule, definition, interpretation, and administrative construction would turn a framework into a hide-bound behemoth of legal provisions addressing all manner of minutia that would require years to modify for even the most basic of reasons.  "[W]ere the shoe on the other foot," (NRDC's Br. at 32), and were IDEM promulgating an interpretation *tightening* pollution restrictions, we doubt that NRDC would be making this claim with such force.

NRDC also maintains that IDEM consistently (and in a mirror of the EPA) interpreted "chemical process plant" to include fuel ethanol plants.  But this is neither disputed nor

especially persuasive. "[O]nce an administrative agency's interpretation of a regulatory statute is deemed reasonable, the reviewing court shall terminate its analysis and not address the reasonableness of a conflicting interpretation." Ind. Dep't of Envtl. Mgmt. v. Boone Cnty. Res. Sys., Inc., 803 N.E.2d 267, 274 (Ind. Ct. App. 2004), trans. denied. Thus, even if we presumed that such a past interpretation was itself reasonable, this does not foreclose the possibility that a different (and even opposite) interpretation might be equally reasonable.

The only question here, then, is whether IDEM's new interpretation is reasonable and supports the issuance of the permits in this case. More specifically, the question is whether the regulatory phrase "chemical process plant" can reasonably be interpreted to permit exclusion of fuel ethanol plants.

Appellate courts review questions of regulatory interpretation in a similar manner as questions of statutory interpretation. Ind. Port Comm'n v. Consol. Grain & Barge Co., 701 N.E.2d 882, 890 (Ind. Ct. App. 1998), trans. denied. As we said, however, when the meaning of an administrative regulation is in question we give great weight to the interpretation put in place by the relevant agency—unless that interpretation would be inconsistent with the regulation itself. Griffin, 730 N.E.2d at 1257; State Bd. of Tax Com'rs v. Two Market Square Assocs. Ltd. Partnership, 679 N.E.2d 882, 886 (Ind. 1997). And the foremost goal of regulatory construction—like with statutory interpretation—is to give the words and phrases in the regulations their plain and ordinary meaning, within the context of the regulatory scheme in a way that reflects the intent of the agency that promulgated the regulations. Id. at 885–86.

NRDC argues that the plain meaning of "chemical process plant" must include fuel ethanol plants, because the phrase "refers on its face to a category of industrial facilities that utilize chemical processes to produce chemical products," and "[f]uel ethanol plants fall squarely within that definition" because "converting raw plant matter to fuel ethanol is a chemical process." (NRDC's Br. at 39–40.) But we do not see interpretation of the phrase as needing to be that strict.

14

For one thing, the Ethanol Rule points out that up until its adoption, the production of ethanol was treated differently depending on whether it was for human consumption or fuel production. 72 Fed. Reg. at 24062. If, as NRDC argues, interpretation of the phrase "chemical process plant" is as simple as looking at whether making fuel ethanol involves a chemical process, then certainly the same should always have been true of making food-grade ethanol. And yet it was not.

The Ethanol Rule also states that the EPA

> [does] not believe the term "chemical process plant" is subject to a "plain meaning interpretation." There is not a universally accepted definition of chemical process, and accepted definitions differ depending on whether you view the term from a purely scientific sense or from an engineering sense, or for economic purposes. The scope of the chemical industry is in part shaped by custom rather than logic and excludes industries that nevertheless engage in chemical processes, e.g., petroleum refineries are a separate category on the [U.S.C. § 7479(1)] list.

72 Fed. Reg. at 24063. Additionally, "[t]he specific chemical process relevant here, natural fermentation, is common to many industries," including some not on the list of twenty-eight source categories. Id. "Accordingly, we do not believe that whether or not an industry engages in a 'chemical process' and specifically whether it engages in 'natural fermentation' can be used as the decisive factor in determining whether Congress intended the industry to be included within the 'chemical process plants' category." Id.

NRDC does not explain why or how its view of "chemical process plant" applies only to fuel-grade ethanol plants and not ethanol plants producing ethanol for human consumption; or to any other plants that employ a chemical as part of a process. Under such an interpretation the phrase "chemical process plant" would undoubtedly subsume many—if not all—of the other twenty-eight major source categories enumerated in Indiana's SIP. See, e.g., 326 Ind. Admin. Code 2-2-1(ff)(1)(J) ("Hydrofluoric, sulfuric, and nitric acid plants"), -1(ff)(1)(K) ("Petroleum refineries"), -1(ff)(1)(R) ("Fuel conversion plants").

15

We therefore reject NRDC's claim that the language of Indiana's SIP mandates that IDEM employ such a rigid interpretation of the words it chose to employ. We will not interpret a regulatory phrase in a way that both produces absurd results and vitiates other regulatory provisions for the sake of strictly applying the "plain meaning" canon of regulatory interpretation. "[W]e give words their common and ordinary meaning *without unduly emphasizing a strict literal or selective reading of the individual words*." Ind. Port Comm'n, 701 N.E.2d at 890 (emphasis added). Instead our "plain meaning" review must be primarily aimed at "giving effect to the intention of the administrative body that promulgated the rule." Id.

And that intent could not be clearer. Prior to 2007, IDEM consistently classified fuel ethanol plants as chemical process plants. It did so because the EPA did so. And when the EPA changed course and issued the Ethanol Rule, IDEM followed suit—with the Indiana General Assembly's approval.

When the federal agency charged with implementing the Clean Air Act, the Indiana General Assembly, and the state agency charged with drafting and applying Indiana's SIP all concur as to what a regulatory phrase includes—or does not include—and nothing in that interpretation conflicts with the rest of the regulatory scheme, we think that interpretation must stand.

Whether the interpretation is sound public or environmental policy is not something we review, nor do we seek to propose a long-term judicial definition of "chemical process plant" that will bind IDEM to our view of how that phrase should apply in every circumstance. The question we face is only whether IDEM's exclusion of fuel ethanol plants from that phrase is reasonable, and we find that it is.

16

## Conclusion

Neither the Clean Air Act nor Indiana's State Implementation Plan mandate that IDEM pursue the formal SIP revision process before excluding fuel ethanol plants from the chemical process plant major source category. Moreover, there is nothing unreasonable in IDEM's decision to define "chemical process plant" to incorporate such an exclusion as a matter of regulatory interpretation. We therefore affirm the trial court.

Rush, C.J., Dickson, Rucker, and Massa, JJ., concur.