## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 10 2020, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Norris Cunningham
Kathryn Elias Cordell
Katz Korin Cunningham PC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin M. L. Jones
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Golden Gate National Senior Care, LLC d/b/a Golden Living,

*Appellant-Petitioner,*

v.

Indiana Family and Social Services Administration,

*Appellee-Respondent.*

February 10, 2020

Court of Appeals Case No. 19A-PL-1269

Appeal from the Marion Superior Court

The Honorable Cynthia J. Ayers, Judge

Trial Court Cause No. 49D04-1802-PL-5532

**Bailey, Judge.**

# Case Summary

Golden Gate National Senior Care, LLC d/b/a Golden Living ("Golden") submitted Nursing Facility Financial Reports (to be used in accordance with 405 IAC 1-14.6)[1] to the Office of Medicaid Policy and Planning ("OMPP"), a division of the Indiana Family and Social Services Administration ("FSSA"). After OMPP auditors made changes to the entries ultimately reducing reimbursement, Golden pursued an administrative appeal of the revisions. An Administrative Law Judge ("ALJ") denied Golden relief; a designee of ultimate authority for the FSSA adopted the ALJ decision without modification; Golden petitioned the Marion County Superior Court for judicial review; the trial court upheld the agency decision; and Golden now appeals. We affirm.

# Issues

Golden presents two issues for review:

I.   Whether Golden was denied due process in the hearing before the ALJ; and

II.  Whether the order on petition for judicial review is contrary to law.

---

[1] This section of the Indiana Administrative Code sets forth payment procedures and rate setting criteria for nursing facilities.

# Facts and Procedural History

[3] Golden owns and operates multiple long-term care facilities throughout the State of Indiana. As an authorized provider of Medicaid-covered services, Golden is required to submit for each facility and year of operation a form titled Nursing Facility Financial Report. The forms are to be used in accordance with the provisions of 405 IAC 1-14.6 and an instruction booklet is provided to promote compliance. The reports are audited by Myers & Stauffer, accountants contracted by the OMPP ("Auditors"). This case involves disputes between the care provider and Auditors as to proper categorization of cost items reported on the forms for rate years 2011 and 2014.

[4] When the Auditors reviewed Golden's cost reports for those years, they determined that certain items on twenty-two reports should be reclassified or disallowed. Specifically, costs reported as direct care costs incurred by 360 Healthcare and Clinical Services, two entities related to Golden,[2] were reclassified as if they had been incurred directly by Golden (by placement into subcategories of capital, plant operations, and administration). A software-related item was moved from amortization of a capitalized cost to a category for depreciation of building and fixtures. Reported costs for software maintenance and software license fees were moved from a "repairs and

---

[2] Pursuant to IAC 1-14.6-2(ff), a party is a related party when the provider is associated or affiliated with or has the ability to control or be controlled by the organization furnishing the service, facilities, or supplies, regardless of whether control is actually exercised.

maintenance" category to "other administrative costs." Appealed Order at 2. A reported cost for medical equipment rental was moved from a "direct care" category to an "equipment lease/rent" category. *Id.* The changes ultimately resulted in a reduced reimbursement to Golden, estimated to be approximately one million dollars.

[5] Golden asked for reconsideration from the Auditors, but on July 16, 2013, the Auditors issued a reconsideration response letter without making any further adjustment. On September 13, 2013, Golden filed a Petition for Review and Request for Hearing with the OMPP. Golden articulated five issues for review, specifically, whether the Auditors improperly reclassified: (1) expenses reported as direct care costs of Clinical Services for clinical and dietary consulting services; (2) expenses reported as direct care costs of 360 Healthcare, a temporary staffing agency; (3) software development amortization, reported as a capital component; (4) software maintenance; and (5) costs for durable medical equipment. Golden alleged that the Auditors failed to identify applicable administrative rules justifying their changes.

[6] The ALJ conducted a telephonic appeal hearing on September 7, 2016. Golden presented two witnesses to explain the bases for Golden's reporting and OMPP presented the testimony of an accountant. Golden conceded that 360 Healthcare and Clinical Services Argument were entities related to Golden but argued that the reported costs reflected no profit margin and there were no inflated costs.

[7] As for the treatment of software costs, Golden argued that the Auditors' decisions lacked specificity and were not supported by appropriate authority. By the time of the hearing, OMPP had issued a bulletin changing its position on treatment of durable medical equipment. Prospectively, OMPP allowed specified rental equipment to be included as a direct care cost. To provide some retroactive relief, OMPP had created a settlement pool; however, claimants were able to claim additional compensation retroactive only to October 1, 2011. Golden argued that reimbursement should have been retroactive to July 1, 2011, the beginning of the administrative agency fiscal year.

[8] OMPP's witness conceded that former auditors may have treated certain items differently, and that the Auditors made some changes in light of revised research. However, he maintained that the Auditors attempted to discern the most appropriate category and all providers were treated uniformly. As for durable medical equipment reimbursement, OMPP took the position that it was not required by law to utilize the fiscal year start preferred by Golden.

[9] On September 28, 2016, the ALJ issued a ruling denying Golden relief. In relevant part, the findings and conclusions thereon provide:

[Findings]

I find that Clinical and 360 are related companies to Golden Living.

I find that as related companies the costs incurred relative to Clinical and 360 must be reported in the same way as if the costs had been incurred by Golden Living itself.

Golden Living is required to report its costs on the specific lines relative to those costs, i.e. benefit, capital, plant and administration and not to simply lump its costs together as services provided. Therefore, the costs from Clinical and 360 were also required to be broken down into benefit, capital, plant and administration.

I find that the decision by M & S to reclassify software depreciation costs from other capital expenses (line 377) to depreciation building and fixtures (line 362) must be broken down into two issues: was it correct to reclassify the software amortization costs from line 377; and was it correct to reclassify those costs to line 362.

I find that insufficient evidence was presented by either party to convince me of the proper categorization of the software amortization costs. I find that M & S was correct in reclassifying the costs from line 377 because intangible software costs cannot logically be considered a capital expense.

I find that M & S was incorrect in reclassifying the costs to line 362 because software development costs involve an intangible item that, unless it controls the HVAC or security of the plant, is clearly not a fixture or facility cost.

I find that some distinction can be made between software support and software maintenance. Support is generally understood to include the provision of expertise in operating the existing software, whereas software maintenance is generally considered to include the modification of the core software to change or improve it.

I find that the distinctions described above do not rise to the level of separating support and maintenance into two utterly different sorts of endeavor. The position taken by Petitioner that they are two completely different types of endeavor that should be report[ed] on different lines in the cost report is not supported by the evidence. M & S acted reasonably in reclassifying those costs to line 353.

I find that the decision to provide additional reimbursement related to the rental costs for low air loss mattresses, pressure support surfaces and oxygen concentrators was a change in Medicaid policy, not a correction of a previously incorrect policy. Therefore, OMPP's decision to wait for confirmed authorization from CMS to provide such reimbursements, thereby causing the reimbursements to be retroactive to October 1, 2011 rather than July 1, 2011, was reasonable.

## CONCLUSIONS OF LAW

Issue 1 – Reclassification of fees for Clinical and 360

1. Pursuant to 405 IAC 1-14.6-11(a), costs applicable to services provided by a related organization must be included in the allowable cost *in the unit of service of the provider at the cost to the related organization*.

2. Clinical and 360 are organizations related to Golden Living through mutual ownership.

3. To the same extent that Golden Living could not simply state a cost as "services performed," neither can Clinical or 360. M & S was correct in reclassifying the costs for the services performed by Clinical and 360 into separate classifications for benefit, capital, plant and administration.

Issue 2 – Reclassification of software development amortization

4. There is no clear-cut cost line for the costs related to the amortization of the expenses in development of software. Any of several could be used.

5. Pursuant to IC 4-21.5-3-14(c), the agency or other person requesting that an agency take action or asserting an affirmative defense specified by law has the burden of persuasion and the burden of going forward with the proof of the request or affirmative defense.

6. Petitioner has failed to provide sufficient evidence that reporting the software development costs on Line 377 – other capital expenses, is any more appropriate than reporting it on Line 362 – maintenance of facility and fixtures.

Issue 3 – Determination that Software Maintenance and Support are one item and reclassifying that item as an administrative cost

7. Petitioner's argument that software maintenance and software support are clearly understood to be distinctly different services is not supported by the evidence. While some have differentiated them by saying that support is the provision of assistance in navigating the processes of an existing software installation, while maintenance is the provision of technical services to modify, correct or update a software installation, this is not a definition universally accepted. Petitioner has failed to carry the burden of proof here.

8. There is evidence that what Petitioner labels as support and as maintenance can both be classified as aspects of the more generic definition of software support.

9. Petitioner has also failed to carry the burden of proof that classification of software support (including the maintenance aspect of support) as a facility maintenance item is clearly correct, but that M & S's classification as an administrative expense is not.

Issue 4 – Determination to provide increased reimbursement for certain durable medical equipment retroactive to July 1, 2011 rather than October 1, 2011

10. The determination to increase reimbursement for certain items of durable medical equipment was an amendment to Medicaid policy, not a correction to a prior incorrect policy.

11. OMPP was under no obligation to set the date for (retroactive) reimbursement to begin at any particular date. It was within its authority to wait for concurrence from CMS and set the date for reimbursement at the higher rate at October 1, 2011.

(App. Vol. II, pgs. 28-30.) Ultimately, the ALJ was not convinced that "the Agency [actions] were improper or incorrect." *Id.* at 30. On January 12, 2018, the Designee of the Ultimate Authority for the FSSA entered the final agency order, affirming the ALJ findings and conclusions without modification.

[10] Golden filed a petition for judicial review and, on March 14, 2019, the parties appeared for a hearing in the Marion Superior Court. Golden argued that the final FSSA order was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law "because it conflicts with its own regulations, its own provisions and its longstanding practice." (Tr. at 7.) FSSA defended its

final decision, arguing that reclassifications made by the OMPP auditors were reasonable, notwithstanding divergence from practices of past auditors.

[11] On May 9, 2019, the trial court issued its Order on Petition for Judicial Review. The trial court concluded that Golden had shown no violation of law in the expense classifications imposed by the Auditors and that "FSSA was under no legal requirement to extend the retroactive period [for durable medical equipment] to July 1, 2011." Appealed Order at 5. Golden now appeals.

# Discussion and Decision

## Standard of Review

[12] The applicable standard of review is well-settled:

> We review an administrative action using the guideposts set forth in Indiana's Administrative Orders and Procedures Act, under which we may set aside an agency's action if it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence." Ind. Code § 4-21.5-5-14(d).

> A party seeking judicial review bears the burden of proving the agency action is invalid for one of the above reasons. Ind. Code § 4-21.5-5-14(a). "Our review of agency action is intentionally limited, as we recognize an agency has expertise in its field and the public relies on its authority to govern in that area." *West v. Office of Indiana Sec'y of State*, 54 N.E.3d 349, 352-53 (Ind. 2016) (citing *Ind. Wholesale Wine & Liquor Co. v. State ex rel. Ind. Alcoholic*

*Beverage Comm'n*, 695 N.E.2d 99, 105 (Ind. 1998)). When reviewing a challenge to an administrative agency's decision, we will not try the facts *de novo*, nor substitute our own judgment for that of the agency. *Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016) (internal citations and quotations omitted). Rather, we defer to the agency's findings if they are supported by substantial evidence. *Id.* (citing *Ind. Dep't of Envtl. Mgmt. v. West*, 838 N.E.2d 408, 415 (Ind. 2005)). On the other hand, an agency's conclusions of law are ordinarily reviewed *de novo*. *Id.* (citing *Nat. Res. Def. Council v. Poet Biorefining – N. Manchester, LLC*, 15 N.E.3d 555, 561 (Ind. 2014)).

*Ind. Alcohol and Tobacco v. Spirited Sales*, 79 N.E.3d 371, 375 (Ind. 2017). "The action of an administrative agency is arbitrary and capricious only where there is no reasonable basis for that action." *Bd. of Trustees of Public Employees Retirement Fund v. Baughman*, 450 N.E.2d 95, 97 (Ind. Ct. App. 1983).

# Procedural Due Process

[13]     Golden argues that it was denied procedural due process at the ALJ hearing, in particular, that Golden was deprived of the opportunity to question one or more persons with whom the sole OMPP witness conferred during his testimony. "While wide latitude is allowed an administrative body in the conduct of its hearings, due process of law must be accorded to those whose rights are affected." *Ladd v. Rev. Bd.*, 150 Ind. App. 632, 637, 276 N.E.2d 871, 873 (1971).

[14]     The OMPP responds that Golden acquiesced to the manner in which the ALJ proceedings were conducted and raised no due process challenge in the

administrative or trial court proceedings. "In order to properly preserve an issue on appeal, a party must, at a minimum, show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal." *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004).

[15] At the September 7, 2016 telephonic hearing, the OMPP called as its witness Adam Langford, CPA ("Langford"). During Langford's testimony, the following exchange took place between the ALJ and Golden's counsel:

> Judge: I just wanted to let you know, several people from Myers and Stauffer are here, and sometimes they confer before Mr. Langford answers. Whether that makes any difference in the world, I just want you to know that's gone on.
>
> Counsel: Well, I appreciate that, Your Honor, and I'm going to ask, sir, that if whoever provides that information to Mr. Langford, I'll ask that information – that I be allowed to question them as well.
>
> Judge: Well, they're just conferring.
>
> Counsel: Okay.
>
> Judge: The person is not testifying, they're just – I just – I'm not sure about that, no, but I did want you to know that. You know, Mr. Langford is the one stating this for the record.
>
> Counsel: Okay.

> Judge: But regardless of whether that's important, I don't think it's up to me to decide whether it's important that they're conferring. I wanted you to know.
>
> Counsel: I appreciate that, sir.

(App. Vol. III, pgs. 76-77.) Thereafter, no additional witnesses were called, and the matter was not addressed again. Arguably, counsel's response to learning of Langford's conferring with colleagues could be construed as a request for additional witnesses. Arguably, the ALJ's language – vacillating from "not sure" to "no" – could be construed as a denial. But even assuming the ALJ affirmatively denied a request from Golden for additional witnesses, Golden did not question Langford as to the nature or substance of the conferences. Golden made no offer of proof. Simply, Golden did not develop a record from which the trial court or this Court could discern any harm to Golden. *See, e.g., Ladd*, 150 Ind. App. at 637, 276 N.E.2d at 874 (observing that, had a claimant not been permitted to answer questions on availability for employment, a central issue in the matter, "a denial of due process would have occurred," but the record must substantiate more than a "naked allegation.")

## OMPP Reimbursements

[16] Golden contends that "OMPP's reclassification was fundamentally unsupported by the statutory authority cited by OMPP" and thus the FSSA decision allowing the reclassification was arbitrary, capricious, and not in accordance with law. Appellant's Brief at 9. Golden's attack is two-pronged; according to Golden, Auditors should not deviate from practices or

interpretations of prior auditors upon which a provider has relied and Auditors should not deviate from an initial and specific citation to legal authority used to justify a reclassification.

[17] Golden first addresses the change made as to "related parties" and claims that "OMPP unreasonably interpreted the definition of related parties and how the related parties were to be treated in determining Medicaid reimbursement." *Id.* at 14. Golden reiterates that prior auditors accepted reporting of costs for Clinical Services and 360 Healthcare as direct care costs and argues that "the testimony shows that the reclassifications performed by [Auditors] were in direct conflict with OMPP's prior treatment of related parties." *Id.* at 15. Golden observes that Auditors first identified a regulation pertaining to management consulting agreements, but later admitted that costs for Clinical Services and 360 Healthcare were not incurred as part of a management consulting agreement, looked at regulations in more detail, and "began to rely upon [US Centers for Medicare & Medicaid Services] CMS Publication 15-1 § 1005." *Id.* at 17. According to Golden, "the litany of the changes in the basis of reclassification" show the "arbitrariness and capriciousness of the agency decision." *Id.*

[18] Langford testified that the CMS publication addressed related party applications with more specificity than did the Indiana Administrative Code. At that time, Section 1005 of CMS Publication 15-1 provided:

> The related organization's costs include all reasonable costs, direct and indirect, incurred in the furnishing of services,

facilities, and supplies to the provider. The intent is to treat the costs incurred by the supplier as if they were incurred by the provider itself. Therefore, if a cost would be unallowable if incurred by the provider itself, it would be similarly unallowable to the related organization. The principles of reimbursement of provider costs described elsewhere in this manual will generally be followed in determining the reasonableness and allow ability of the related organization's costs, except where application of a principle in a nonprovider entity would be clearly inappropriate.

[19]   Golden does not deny the applicability of the provision or challenge the factual determination that Clinical Services and 360 Healthcare were "related parties" to Golden. Rather, Golden faults Auditors' late discovery of the provision (allegedly only in response to Golden's persistent questions) and the "reliance upon a single line" (the language addressing intent). Appellant's Brief at 18.

[20]   Apparently, past auditors did not question Golden's reporting of some related party costs as direct care costs. Golden also points to the testimony of its witness that, although Golden reported related party costs as direct costs, there was no profit included and no artificially inflated costs.[3] Golden assumes that the fact-finder was obliged to credit the testimony of its witness as to inclusion of profit. At bottom, Golden's arguments fail to comport with the standard of

---

[3] Golden asserted that it had complied with CMS Publication 15-1 § 1000, providing: "Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere. The purpose of this principle is two-fold: (1) to avoid the payment of a profit factor to the provider through the related organization (whether related by common ownership or control), and (2) to avoid payment of artificially inflated costs which may be generated from less than arm's-length bargaining."

review. Golden had to support its allegations that an agency action was not in accordance with law or was arbitrary or capricious. The agency did not have to demonstrate to the trial court that its action was in conformity with prior auditors' practices or based solely upon its initial legal research.

[21] Rather, a review concerns reasonableness of agency interpretation. Appellate review of an agency action is intentionally limited, in recognition that an agency has expertise in its field and the public relies on its authority to govern in that area. *Moriarity v. Ind. Dep't of Nat. Resources*, 113 N.E.3d 614, 619 (Ind. 2019). The *Moriarity* Court reiterated, "In fact, if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation." *Id.* (citation omitted). Such is the case here, where costs of related party suppliers were to be reported as if incurred by the provider.

[22] Similarly, with respect to the treatment of amortization of purchased software and the allocation of software support and maintenance costs, the ultimate agency interpretation need only be a reasonable one. Golden reported software amortization as if it were the amortization of a capital investment item. The Auditors disagreed with this selection, and initially identified a category for depreciation of fixtures and facilities as more appropriate. In light of the testimony that this was also not a perfect-fit category, Golden argues that the Auditors should be bound to accept Golden's categorization. Too, Golden insists that the OMPP classifications pertaining to software were inadequate, and software support must be categorized separately from software

maintenance, such that only some of the costs are considered administrative costs.[4] Golden essentially asked the ALJ, the trial court, and now this Court to determine the best accounting practices.

[23] Neither the mandatory form nor accompanying instructions, however lengthy, would likely include a precise designation for each and every type of expense incurred in the operation of a nursing facility. Predictably, there could be some room for disagreement among accounting professionals when selection decisions must be made. But administrative review does not necessarily achieve perfection in reporting standards where there can be some disagreement among accounting professionals. The ALJ said as much when he discussed the lack of an obvious fit for software amortization costs and the lumping together of similar, but not identical, costs related to functionality of the software. One certified public accountant testified; no other individual was presented as an accounting expert witness. Notwithstanding Golden's quest for added specificity, Golden has not persuaded us that the agency interpretation was unreasonable or that there was an action taken contrary to law.

[24] Golden's final contention is that, when the OMPP discovered error in the rate of reimbursement for durable medical equipment, it should have taken remedial

---

[4] Administrative costs are not reimbursed at the same rate as direct care costs. In 2013, the Medicaid form was revised to include an option to separate direct care software costs from administrative software costs.

measures retroactive to July 1, 2011 as opposed to October 1, 2011, and its failure to do so is contrary to law.

[25] Golden employee Pamela Orsini ("Orsini") testified that the FSSA issued "a bulletin addressing [Durable Medical Expenses] and changes of the facility reimbursement rules because there's been a lot of pushback from the provider community." (App. Vol. III, pg. 39.) The bulletin advised that, effective October 1, 2011, OMPP would add seventy-five cents per day to the Medicaid rate and the equipment cost would be a direct cost no longer reimbursed as part of a fair rental rate.[5] Orsini considered the bulletin to constitute an agency admission that error had caused past inadequate reimbursement and she deemed the settlement pool – allowing for claims effective October 1, 2011 – to be an inadequate recompense for the error. According to Orsini, "if [the agency] is not wrong, why is there reimbursement all of a sudden after provider pushback?" *Id.* at 46. The OMPP took the position that there had merely been a change in reimbursement policy, and it was under no legal obligation to allow settlement pool claims at an earlier date.

[26] Again, we regard the agency interpretation of its obligation as reasonable. Although Golden suggests that a lack of agency diligence caused undue delay in getting changes approved by the Center for Medicare and Medicaid and the

---

[5] Effective July 1, 2012, the reimbursement rate was raised to $1.50 per day.

establishment of the settlement, Golden points to no legal authority requiring the OMPP to provide for reimbursement as of the date requested by Golden.

# Conclusion

The reviewing court's decision affirming the final order of the FSSA is not contrary to law.

Affirmed.

Kirsch, J., and Mathias, J., concur.