

FILED

Mar 27 2023, 8:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Randall R. Fearnow
Quarles & Brady LLP
Chicago, Illinois

Lucy R. Dollens
Roxanne M. Hilton
Sarah T. Parks
Quarles & Brady LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| American Senior Communities, | March 27, 2023 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 22A-PL-2556 |
| v. | Appeal from the Marion Superior Court |
| Indiana Family & Social Services Administration, | The Honorable Marc T. Rothenberg, Judge |
| *Appellee-Respondent* | Trial Court Cause No. 49D07-2109-PL-30994 |

**Opinion by Judge Crone**
Judges Robb and Kenworthy concur.

**Crone, Judge.**

# Case Summary

For purposes of Medicaid reimbursement, American Senior Communities (ASC) submitted a Medicaid cost report that classified the Nursing Scheduler Coordinator position as a direct care component. The Office of Medicaid Policy and Planning (OMPP) reclassified the position as an administrative component. ASC appealed, and the administrative law judge (ALJ) concluded that OMPP had a reasonable basis for the reclassification. The ALJ's order was upheld by the Indiana Family and Social Services Administration (FSSA), which in turn was affirmed by the trial court. ASC now appeals, arguing that the reclassification of the Nursing Scheduler Coordinator position from the direct care component to the administrative component was arbitrary and capricious. We disagree and therefore affirm.

# Facts and Procedural History

ASC operates seventy-eight nursing facilities, all of which employ a Nursing Scheduler Coordinator. ASC classified the position of Nursing Scheduler Coordinator as a direct care component in its 2016 and 2018 Medicaid cost reports relating to Medicaid rate effective dates of July 1, 2017, and July 1, 2019, respectively. In brief, the "direct care component" refers to "direct patient care services and supplies." 405 Ind. Admin. Code (IAC) 1-14.6-2(p). OMPP administers the Medicaid program for FSSA. OMPP contracted Myers & Stauffer, LP, to perform compliance reviews of facilities' cost reports, reviewing allowable costs and correct classification of the reported costs. Myers & Stauffer reviewed ASC's Medicaid cost reports on behalf of OMPP and determined that

the Nursing Scheduler Coordinator position should be reclassified from the direct care component to the administrative component. The administrative component refers to "administrative services" and includes "[o]ffice and clerical staff." 405 IAC 1-14.6-2(b). These two components receive different Medicaid reimbursement rates. Accordingly, Myers & Stauffer issued rate change notices on the abovementioned Medicaid cost reports for all of ASC's seventy-eight nursing facilities. Myers & Stauffer's reclassification resulted in a reduction in Medicaid reimbursements to ASC of approximately $3.3 million.

[3]     ASC requested reconsideration of the reclassification, which Myers & Stauffer denied. ASC then filed petitions for administrative review of the reclassification. After the appointed ALJ granted ASC's request to consolidate the two administrative appeals, ASC and OMPP each filed summary judgment motions. The ALJ granted summary judgment in favor of OMPP. Appellant's App. Vol. 2 at 14-17. In sum, the ALJ concluded, "There is a clearly reasonable basis for the [Nursing Scheduler Coordinator] position to be included within a cost report's administrative component rather than direct care component" and "OMPP through its contractor did not act arbitrarily and capriciously by reclassifying this position accordingly." *Id*. at 17.

[4]     ASC filed an objection to the ALJ's decision. FSSA's ultimate authority issued a final agency order, in which it adopted the ALJ's findings of fact and concluded as follows:

> All members of the staff at a nursing facility influence the care
> and well-being of the patients. Maintenance workers make sure

that the heat works during the winter; office staff make sure that the power bills are paid; and payroll staff make sure that the nurses are paid so that they can continue to work. Yet these staff persons clearly fall under the administrative designation and not the hands-on designation. Absent an express definition otherwise, logic dictates that the Nursing Schedule[r] Coordinator is another position whose services are vital, but administrative in nature.

*Id*. at 19. Accordingly, FSSA's ultimate authority upheld the ALJ's decision.

[5] ASC petitioned for judicial review of FSSA's final order pursuant to the Indiana Administrative Orders and Procedures Act (AOPA). Following a hearing, the trial court issued findings of fact and conclusions of law, concluding that FSSA "properly adjusted the payment rate for ASC's [Nursing Scheduler Coordinators] due to their lack of direct contact with patients." Appealed Order at 8. ASC now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

[6] In an appeal involving an administrative agency's decision, our standard of review is governed by the AOPA, and we are bound by the same standard of review as the trial court. *Ind. Bd. of Pharmacy v. Elmer*, 171 N.E.3d 1045, 1049 (Ind. Ct. App. 2021), *trans. denied*. "We do not try the case de novo and do not substitute our judgment for that of the agency." *Walker v. State Bd. of Dentistry*, 5 N.E.3d 445, 448 (Ind. Ct. App. 2014), *trans. denied*.

We will reverse the administrative decision only if it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right,

> power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

*Id.* (citing Ind. Code § 4-21.5-5-14). "A decision is arbitrary and capricious when it is made without consideration of the facts and lacks any basis that may lead a reasonable person to make the decision made by the administrative agency." *Ind. Real Estate Comm'n v. Martin*, 836 N.E.2d 311, 313 (Ind. Ct. App. 2005), *trans. denied* (2006). "The burden of demonstrating the invalidity of the agency action is on the party who asserts the invalidity." *Walker*, 5 N.E.3d at 449.

[7] ASC argues that FSSA's interpretation of 405 IAC 1-14.6-2 is arbitrary and capricious. "Appellate courts review questions of regulatory interpretation in a similar manner as questions of statutory interpretation." *Nat. Res. Def. Council v. Poet Biorefining-N. Manchester, LLC*, 15 N.E.3d 555, 564 (Ind. 2014). "An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *City of Gary v. Ind. Dep't of Env't Mgmt.*, 967 N.E.2d 1053, 1057 (Ind. Ct. App. 2012) (quoting *Dev. Servs. Alts., Inc. v. Ind. Family & Soc. Servs. Admin.*, 915 N.E.2d 169, 181 (Ind. Ct. App. 2009), *trans. denied* (2010)).

> If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation.

> Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. However, an agency's incorrect interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

*Id*. (emphasis omitted) (quoting *Dev. Servs. Alts.*, 915 N.E.2d 181). "[T]the foremost goal of regulatory construction—like with statutory interpretation—is to give the words and phrases in the regulations their plain and ordinary meaning, within the context of the regulatory scheme in a way that reflects the intent of the agency that promulgated the regulations." *Poet Biorefining*, 15 N.E.3d at 564.

[8]   OMPP classified the Nursing Scheduler Coordinator as an administrative component, which is defined in 405 IAC 1-14.6-2(b)(3) as "the portion of the Medicaid rate that shall reimburse providers for allowable administrative services and supplies, including prorated employee benefits based on salaries and wages. Administrative services and supplies includes … [o]ffice and clerical staff."

[9]   ASC asserts that the position of Nursing Scheduler Coordinator "fits squarely within the definition of the direct care component." Appellant's Br. at 20. 405 IAC 1-14.6-2(p) defines the direct care component as

> the portion of the Medicaid rate that shall reimburse providers for allowable *direct patient care services and supplies*, including prorated

employee benefits based on salaries and wages. Direct care services and supplies include all of the following:

(1) Nursing and nursing aide services.

(2) *Nurse consulting services directly related to the provision of hands-on resident care.*

(3) Pharmacy consultants.

(4) Medical director services.

(5) Nurse aide training.

(Emphases added.)[1]

[10] ASC's job description for the Nursing Scheduler Coordinator provides, "The Nursing Scheduler Coordinator is responsible for the overall assurances of appropriate staffing levels are met [sic] at all times with accordance to state and federal regulations and budgetary settings." Appellant's App. Vol. 2 at 222. In addition, the job description lists fourteen "Essential Position Functions," which, not surprisingly, include such functions as creating and adjusting the staffing schedule for the nursing department, recommending new scheduling practices to improve efficiency, advising the executive director and director of nursing services of all staffing and scheduling needs, handling questions

---

[1] We have included the most relevant of the sixteen services and supplies that are listed.

regarding scheduling needs, conducting initial interviews with nursing applicants, completing reference checks on potential new nursing hires, serving as a liaison with the payroll coordinator regarding payroll matters, and scheduling new nursing assistants for skills validation and training. *Id.* We observe that none of the listed functions involves "direct patient care services and supplies." 405 IAC 1-14.6-2(p). ASC concedes this point but asserts that the Nursing Scheduler Coordinator provides "nurse consulting services directly related to the provision of hands-on resident care." *See* 405 IAC 1-14.6-2(p)(2).

[11] Based upon the plain and ordinary meanings of the terms administrative services and nurse consulting services, ASC's assertion is unavailing. Creating a staffing schedule and the other functions of the Nursing Scheduler Coordinator are commonly understood to be administrative duties performed by office and clerical staff. Generally speaking, consulting services are commonly understood to mean the provision of expert advice. We understand nurse consulting services to be the provision of expert nursing advice or expert advice for nursing. The fact that the Nursing Scheduler Coordinator makes the schedule for the nursing staff does not transform the position into nurse consulting services. We conclude that there is a reasonable basis for OMPP's classification of ASC's Nursing Scheduler Coordinator as an administrative component rather than a direct care component, and therefore the reclassification was not arbitrary and capricious.

[12] ASC also contends that "[t]he ALJ arbitrarily and capriciously restricted the definition of 'direct care components' based on his own, personal internet

research, which does not appear in the record." Appellant's Br. at 26. The ALJ's finding 11 reads,

> Neither party provided significant guidance or argument on what "nurse consulting services" are and what that term should refer to. *Based on the ALJ's prior understanding and experience*, an individual (or a company in some cases) providing nurse consulting services (i.e. a nurse consultant) would generally be someone with specialized education, expertise or experience with whom a nurse, other caregiver, or organization would consult 1) in individualized circumstances, in order to better care for a patient when they are uncertain what to do or need confirmation of a course of action, 2) in broader circumstances, in order to make unit- or organization-wide decisions about patient care and functional/operational issues. A brief general internet search of 'nurse consulting services' and 'nurse consultant' consistently and repeatedly confirmed this prior understanding. Nothing about this case or the arguments made by either side suggests that a significantly different meaning is intended by 405 IAC 1-14.6-2(p)(2). The term does not reasonably describe someone with little more than a high school diploma or equivalent that hands out unit assignments for direct care nurses, even if they "consulted" with other Nursing Department personnel in order to do so. Based on the evidence provided including the Position Description, there is no meaningful resemblance between a nurse consultant as normally understood and ASC's Nurse Schedule[r] Coordinators.

Appellant's App. Vol. 2 at 16 (emphasis added).

[13]  FSSA argues, and the trial court found, that the ALJ's brief internet search constitutes harmless error because the "research was only incidental to the final decision." Appealed Order at 7. We agree. Assuming, without deciding, that

the finding related to the internet search is improper,[2] the error is not prejudicial because the finding is not necessary to support the ALJ's judgment. *See In re B.J.*, 879 N.E.2d 7, 19-20 (Ind. Ct. App. 2008) (stating that a finding of fact is not prejudicial to a party unless it directly supports a conclusion necessary to sustain the judgment), *trans. denied*. The internet search was not the sole support for the ALJ's judgment. We note that the ALJ may rely on his knowledge and experience. Ind. Code § 4-21.5-3-27(d). In addition, the ALJ relied on ASC's brief and the affidavit of ASC's controller in finding that the "position at issue consists of scheduling coordinators, which work in each facility's Nursing Department to make sure the facility's residents have appropriate nurse staffing available to them." Appellant's App. Vol. 2 at 15. ASC does not dispute this finding.

[14] Moreover, the ALJ concluded that "[t]he term 'schedule coordinator' or scheduler' immediately connotes administrative functions," and that even though the Nursing Scheduler Coordinator works in the nursing department and with the executive director and director of nursing "to provide appropriate hands on nurse staffing levels," the duties of the Nursing Scheduler Coordinator remain administrative functions. *Id*. at 17. In addition, the ALJ concluded that the Nursing Scheduler Coordinator is "centered around staffing and scheduling tasks and concerns" and the services "barely" refer to "anything having to do

---

[2] We observe that "a court may take judicial notice of a dictionary definition of a word, so long as the other conditions set out in [Indiana Evidence Rule 201] are met." *Campbell v. Shelton*, 727 N.E.2d 495, 501 (Ind. Ct. App. 2000), *trans. denied* (2001).

with residents or resident care or somehow assisting nurses to perform their hands-on duties." *Id.* These conclusions do not rest on the internet search and support the ALJ's judgment. We conclude that the brief internet search, if error, was harmless error. Based on the foregoing, we affirm the trial court's judgment.

Affirmed.

Robb, J., and Kenworthy, J., concur.